# Huntingdon Presbyterian Congregation v. Stewart.

*Deeds—Building restriction—Construction—Obstruction of view, light and air—Equity—Injunction—Laches—Garage—Nuisance.*

1. The language of a deed containing a building restriction should be interpreted in the light of the apparent object or purpose of the parties and the conditions existing when made.

2. Where an owner of land conveys part thereof, and in the deed covenants for himself and his successors in title not to erect upon the residue of the lot any building which would obstruct the view and light of a church building proposed to be erected on the land conveyed or be a nuisance to such church, such covenant is violated by the erection of a building which would, even to a small extent, obscure the light and which would interfere with the view; and this is the case although the windows of the church are composed of stained glass.

3. Such a building also violates the covenant if it deprives the church members of the free and unobstructed air to which they are entitled.

4. Such a covenant will also be violated if it appears that the building is to be used as a garage.

5. Even the use of the building as a private garage housing only two cars will interfere with church worship and will be a nuisance within the meaning of that word as used in the deed.

6. In such case, it is not proper to apply the principle of law that courts of equity will not award an injunction to abate a private nuisance, but will relegate the party to his action at law.

7. Nor will the principle be applied that no injunction can be granted because plaintiff's rights were not established, inasmuch as plaintiff's rights are established by the deed containing the covenants.

8. Where the church has delayed for two months in filing a bill against the construction of the building and has seen the defendant construct a two-story building at a large expenditure of money, the court will not award a mandatory injunction to compel the removal of the two-story building, but it will enjoin the construction of a third story on the building and also the use of the building as a garage.

Bill in equity for an injunction to enforce a building restriction in a deed. C. P. Huntingdon Co., Sept. T., 1926, No. 281.

*H. H. Waite, C. H. Whittaker* and *Charles G. Brown,* for plaintiff.

*W. M. Henderson, William Wallace Chisolm* and *Robert H. Henderson,* for defendant.

POTTER, P. J., 17th judicial district, specially presiding, Aug. 31, 1926.— From the pleadings and the testimony in this case, we arrive at the following

## Findings of fact.

1. The plaintiff is a corporation, having been duly incorporated under the laws of Pennsylvania, through the Court of Common Pleas of Huntingdon County, on April 15, 1843.

2. The defendant is now, and has been for some years, a resident of Huntingdon, Huntingdon County, Pennsylvania, and is engaged in the wholesale and retail confectionery business.

3. Mifflin Street, in the Borough of Huntingdon, runs east and west and Washington Street is the next street south of it, running parallel with it, and Fifth Street intersects with Mifflin and Washington Streets and runs north and south.

4. The plaintiff is the owner, with additional ground not herein involved, of a lot of ground situate on the southwest corner of Mifflin and Fifth Streets, in the said Borough of Huntingdon, fronting 80 feet on the west side of Fifth Street, and extending westward on the south side of Mifflin Street, on which,

including other land not herein involved, is erected a large commodious brick church, used by the members of the plaintiff congregation for worship and other purposes incident to this congregation.

5. The defendant is the owner of a lot of ground situate on the northwest corner of Washington and Fifth Streets, fronting on the north side of Washington Street 50 feet, extending thence north along the western side of Fifth Street 120 feet to the southern line of the lot owned and occupied by the plaintiff.

6. That a part of the lot of ground upon which stands this church building, owned and occupied by the plaintiff, fronts 50 feet on the south side of Mifflin Street, and extends along the west side of Fifth Street, southward, and of the width of 50 feet, a distance of 80 feet to the north line of the defendant's lot, which is the northern part of lot No. 155 in the recorded plan of the Borough of Huntingdon, and the defendant's lot, as mentioned in our 5th finding, is the southern part of said lot No. 155.

7. Prior to the first day of April, 1871, Christian Colestock, David Colestock and Elizabeth Colestock, of the said Borough of Huntingdon, were the owners in fee of the lot of the defendant, and of that part of the lot of the plaintiff herein described and referred to, both of which comprised the full lot No. 155 hereinbefore mentioned, which fronted on the north side of Washington Street 50 feet, and extended north along Fifth Street a distance of 200 feet to Mifflin Street, and our observations and discussions relative to the dispute before us extend to and embrace this lot only.

8. On April 1, 1871, the said Christian Colestock, David Colestock and Elizabeth Colestock made, executed and delivered to the Huntingdon Presbyterian Congregation, the plaintiff, their successors and assigns, a deed for all that part of lot No. 155 fronting 50 feet on the southern side of Mifflin Street, and extending in depth along the western side of Fifth Street a distance of 80 feet, with the free and unobstructed use and enjoyment of light and air passing over the residue of the lot not then conveyed (which is now owned by the defendant), which deed was duly recorded at Huntingdon, at a later date, which deed contains the following clauses:

(*a*) "To have and to hold the said part of said lot of ground, hereditaments and premises hereby granted or mentioned and intended so to be, with the appurtenances, unto the Huntingdon Presbyterian Congregation, their successors and assigns, to and for the only proper use and behoof the said the Huntingdon Presbyterian Congregation, their successors and assigns forever. And the said Christian Colestock, David Colestock and Elizabeth Colestock, for themselves, their heirs, executors and assigns, covenent and agree that they will not erect or suffer to be erected upon the residue of said lot No. 155 any building which would obstruct the view and light of the proposed church building or be a nuisance to the party of the second part, their successors and assigns.

(*b*) "All that part of lot No. 155, in the Borough of Huntingdon, fronting 50 feet on the south side of Mifflin Street, and extending in depth along the west side of Bath (now Fifth Street) Street 80 feet, with the free and unobstructed use and enjoyment of light and air passing over the residue of the lot herein conveyed."

9. The deed containing the two clauses, as set out in our 8th finding, is marked Exhibit "a" in the files of this case.

10. That the said two clauses as set out in our 8th finding refer to the lands involved in these proceedings, owned and occupied by the plaintiff and the defendant.

11. That the defendant acquired the title to the southern end of said lot which fronts 50 feet on the northern side of Washington Street and extends north along Fifth Street (formerly Bath Street) of the same width, 120 feet, from Martha J. Akers and others, by deed dated April 10, 1920, which deed described the lot of ground conveyed to him as fronting 50 feet on Washington Street and extending back of the same width in a northerly direction along the western line of Fifth Street a distance of 120 feet to the line of the lot owned and occupied by the plaintiff, which was purchased from the said Colestocks on April 1, 1871, which deed contains the following clauses:

(a) "Excepting and reserving from the conveyances the reservations as set forth in a certain deed of Christian, David and Elizabeth Colestock to the Presbyterian Congregation of the Borough of Huntingdon, dated the 1st day of April, 1871, and recorded in the Recorder's Office aforesaid in Deed Book "A," No. 3, page 110.

(b) "To have and to hold the said part of a lot of ground as hereinbefore described, excepting and reserving, however, the reservations and exceptions to the Presbyterian Congregation, of the Borough of Huntingdon, hereinbefore mentioned."

12. The deed referred to in our finding No. 11 is recorded in the Recorder's Office, at Huntingdon, Penna., in Deed Book "M," No. 6, page 157, and also refers to the land involved in this suit, owned by the defendant.

13. That at the time the defendant purchased the said lot of ground from the said Martha J. Akers and others there was erected upon the south end of it, fronting on Washington Street, a two-story brick dwelling-house and office building, covering the entire front of the said lot on Washington Street, which building extended back in a northerly direction along Fifth Street towards the southern line of the lot owned and occupied by the plaintiff to a distance of 70 feet, which included a small two-story building attached to the rear of the main building commonly known as a T or L, which was set back from Fifth Street a distance of about 14 feet, which left an open space of 50 feet between the rear of the northern wall of the dwelling-house and the southern line of the lot owned and occupied by the plaintiff.

14. That this small addition, or T or L to the main building, mentioned in our 13th finding was approximately 15 feet square, with a comb roof, which extended north and south, or towards the church building of the plaintiff, and was about 32 feet high from the ground to the comb of the roof.

15. That on March 22, 1926, the defendant, with full knowledge of the restrictions, exceptions and reservations as contained in the deed from the Colestocks to the plaintiff, and against the protest of the trustees of the plaintiff church, began the erection of an addition to the building which was on the lot when he purchased it, tore down the T or L, has made excavations and has erected a brick wall, now two stories high, which occupies 23 feet along Fifth Street of the lot that was vacant at the time he acquired title to the property, and which covers the 14 feet vacant space that existed between the eastern wall of the T or L and the line of Fifth Street, thereby obstructing the view of the church to a material extent.

16. It is the purpose of the defendant to add another, or a third, story to the now two-story brick building already erected by him, which, if done, will more seriously obstruct the view of the church from Fifth and Washington Streets, and will affect the light and air passing over the residue of the lot, towards the said church, which was vacant at the time he acquired title to the property, and which was vacant at the time the Colestocks made the deed to the plaintiff for the lot of ground hereinbefore mentioned and described.

17. The new building erected by the defendant, now to a height of two stories, on the northern end of his lot, covers ground which was vacant along the line of Fifth Street, and has materially obstructed the view to the church and from it from both Fifth and Washington Streets, and interferes with the light and air passing over the said lot of the defendant towards the said church in violation of the reservations and restrictions contained in the deed from the Colestocks to the plaintiff, as well as in the deed from Martha J. Akers et al. to the defendant.

18. If the defendant be permitted to add a third story to the now two-story building, recently erected by him north of the building which was upon the ground when he purchased the property, the view, both to and from the church, will be more seriously obstructed than it now is with two stories erected, and would be in violation of the reservations and restrictions contained in the deed from the Colestocks to the plaintiff, and will also more seriously interfere with the passage of light and air towards the church over said lot of ground of the defendant.

19. Before the defendant began the erection of the new brick building, he was cautioned by some of the officers of the plaintiff church not to do so, was told they would take out an injunction against him if he did so, to which he paid no heed, but began and went on with the building.

20. The defendant's wife, who was acting as his agent, was present at a meeting of the trustees of the plaintiff church on March 29, 1926, before any extensive excavations were made for the erecting of his proposed building, and was notified that the trustees could give her husband no permission to build upon the vacant ground lying between the southern line of the church lot and the old building of the defendant, and that the matter would have to be passed upon by the members of the congregation at a congregational meeting, but, before such a meeting was called, the defendant began the erection of the building and continued in the work until May 17, 1926, when the injunction was awarded and he was restrained from further proceeding.

21. A congregational meeting was called and held on May 12, 1926, for the result of which the defendant did not wait, but began the building on March 22, 1926.

22. The church building from north to south to the defendant's line does not cover all the lot of the plaintiff, there being a strip of land from east to west, adjoining the defendant's line, 7 or 8 feet in width, which is used as a passageway from Fifth Street to gain access to the rear part of the church building.

23. This passageway is cemented and is used by the children in going to and from the Primary Sunday School room, by persons going to mid-week as well as other church services not held in the main auditorium.

24. The distance between the southern wall of the church and the northern wall of the now two-story building recently erected by the defendant is 35 feet, 27 of which belongs to the defendant and the remaining 8 of which belongs to the plaintiff, being the passageway referred to in findings Nos. 22 and 23.

25. It is the purpose and plan of the defendant to erect a private garage on the western end of the vacant land lying between the church lot and the new building erected by him, extending 18 feet from north to south and 17 feet from east to west, and 10 feet in height. Or, the north end of this proposed garage would be about 9 feet from the church lot-line, or 17 feet from the southern church wall. The roof, at a height of 10 feet, would be 2½ feet above the window-sills of the windows in the southern side of the

church building. The garage to be set back from Fifth Street 33 feet, from which street entrance must necessarily be gained to it. The garage is to house the defendant's touring pleasure car and his business truck.

26. To gain access to the said proposed garage it will be necessary to pass over the Fifth Street sidewalk only a few feet away from the said cement passageway used to reach the rear part of the church by children going to the Primary Sunday School room as well as by adults attending meetings in the rooms in the rear end of the church.

27. If this garage be erected as planned, there must necessarily be more or less noise and odors in and about it, which will interfere with the quiet and comfort of those who worship in the church, and it would be a source of danger to children and adults in going to and from the church by the defendant's automobiles entering and backing out of the garage over the pavement on Fifth Street.

28. If the garage be built, it will interfere with the view to and from the church, with the supply of air from the defendant's lot, be a source of danger to persons coming to and going from the church, and through its noise and odors become a nuisance to the plaintiff.

29. On the lot conveyed by the Colestocks to the plaintiff, the plaintiff erected a large brick church, handsome and imposing in appearance, which is so constructed that its southern wall is about 8 or 9 feet north of the southern line of the plaintiff's lot, with the window-sills about 6 feet above the cement passageway, referred to in our former findings.

30. The entrance to the church, or rather the main entrance, is at its eastern end, on Fifth Street, and the windows are of stained or art glass.

31. At the time of the conveyance by the Colestocks to the plaintiff, the Colestocks had erected upon that part of lot No. 155 retained by them a residence building two and one-half stories high, which extended north to a point 42 feet and 8 inches from the plaintiff's southern lot-line.

32. The residue of lot No. 155 not conveyed to the plaintiff became vested by title in Martha J. Akers, who is identical with Martha Akers hereinbefore mentioned, and upon it, upwards of thirty-five years ago, she erected a two and one-half story building, with an L or T attached to the rear, hereinbefore mentioned, the comb roof of which was about $33\frac{1}{2}$ feet high, the main building covering the entire lot frontage of 50 feet on Washington Street, and extending north to a point 42 feet and 8 inches from the south wall of the plaintiff's church building.

33. The trustees of the plaintiff have the management and the care of their church property.

34. The main building of the defendant, not meaning the part recently erected to a height of two stories, which is involved in this suit, was raised to three stories, the first, or street floor, of which is used as storerooms and the second and third stories of which are used as living apartments, one of which is occupied by the defendant's family.

35. The eastern street floor rooms in defendant's building are used by him in conducting a wholesale and a retail confectionery business, but not in manufacturing.

36. During the winter of 1925 and 1926 the defendant informed the trustees of the plaintiff of his purpose of extending his brick building north to a point 35 feet from the southern main wall of the plaintiff's church building.

37. On March 22, 1926, the defendant began the work of the erection of the present two-story structure involved in this suit, and on that date began the

excavation for the foundations of the walls, the northern of which, extending at right angles to Fifth Street, is 27 feet from the plaintiff's southern line and 35 feet from the southern wall of the church building.

38. From March 22, 1926, the defendant, with his employees, worked continuously and daily upon the construction work of the addition to his building up to the time of the filing of the plaintiff's bill on May 17, 1926, without interference, during the whole of which time plaintiff's trustees and its church members observed the progress of said work, some of whom had knowledge of the extent and character of the building intended by the defendant.

39. From March 22, 1926, to May 17, 1926, the defendant expended in the materials and work on the extension of his building, as aforesaid, the sum of $5365.

40. Up to May 17, 1926, when the injunction was awarded, the defendant had raised the said extension to his building to the height of two stories.

41. It was and is the purpose of the defendant to construct the said extension of his brick building to a height of three stories, and to place thereon a flat roof, making the entire height of the building to be 32 feet and 8 inches.

42. Between defendant's main building (as now constructed to a height of two stories) and the plaintiff's property-line he proposes the erection of a garage, private in character, 10 feet high, with a flat roof, to be constructed of brick, with no doors or windows in the north and west side walls, the present building of the defendant to form the south wall of the garage, the same to be 18 feet, running north and south, and 17 feet, running east and west, the east or front wall of which to be 33 feet or 30 feet back from the pavement on Fifth Street, to be used for the storage of his automobile and his delivery truck, which he says will not be used on Sundays.

43. During the late fall, winter and early spring months of the year, the rays of the sun fall upon the plaintiff's church from the south.

44. The new two-story addition to defendant's building, covering the full width of his lot of 50 feet, extends northward towards plaintiff's church about 7 feet farther than did the T or L on the old building hereinbefore mentioned.

### *Discussion.*

We think it not amiss to say at this time that the writer of this opinion was upon the grounds in dispute on two different occasions, and both times made careful observations as to the questions in controversy, and as testified to by witnesses on both sides.

From our viewpoint, the following questions are involved in this case and are submitted to us for disposition:

1. Does the two-story building, recently erected by the defendant, obstruct the view, light and air of the church building of the plaintiff, and will the addition of another, or a third story to it, more seriously do so?

2. Will the erection of the proposed garage be an obstruction to the view, light and air of the church building of the plaintiff?

3. Will the erection of either of these two buildings in any manner prove to be a nuisance to the plaintiff congregation?

The Colestock deed of the year 1871, conveying to the plaintiff a lot 50 feet wide along Mifflin Street and 80 feet deep along Fifth Street (formerly Bath Street), expressly provides that they "for themselves, their heirs, executors and assigns covenant and agree that they will not erect or suffer to be erected upon the residue of lot No. 155 any building which would obstruct the view and light of the proposed church building, or be a nuisance to the party of the second part, their successors and assigns." This deed also provides "free and

unobstructed use and enjoyment of light and air passing over the residue of the lot herein conveyed," the residue being the part now owned by Stewart.

The language used in these restrictive clauses in this deed is very plain and needs no explanation. The view is not to be obstructed, either to the church or from it. It is idle to say that with the two-story building recently erected by the defendant, the view either to or from the church is not obstructed. There is no limitation placed on the word "obstructed." The deed does not say a material obstruction, or partly obstructed. It does say obstructed, which is defined to mean "to block or stop up—to close—to bar—to be in the way of—to prevent—to impede—to oppose—to retard—to hinder." It is plainly evident that this building, standing out even with Fifth Street, as it now does, and extending along this street 23 feet farther than the old building did, must necessarily obstruct the view to the church from Washington Street more than the old building did. The writer has viewed this aspect of the contention. The plaintiff is entitled to the same view to and from this church now as was given it under the Colestock deed, nothing more and nothing less. This is what it bought and paid for. In the case of Murphy v. Ahlberg, 252 Pa. 267, town lots were conveyed with "the free and unobstructed right of light, air and prospect over and across the front of any other property now owned by the parties of the first part. . . ." One of the lot owners raised his one-story porch to three stories, the second and third stories of which he was compelled to remove because they obstructed the view of another lot owner several lots away. This was not a total obstruction, neither is the case at bar.

Then, also, the language of a deed should be interpreted in the light of the apparent object or purpose of the parties and the conditions existing when made: Meigs v. Lewis, 164 Pa. 597; Dewar v. Carson, 259 Pa. 599. We must conclude that when the Colestocks made their deed, they desired to save for this church a free and unobstructed view to and from it and with free and unobstructed light and air. They knew they were conveying the lot to the plaintiff for building purposes, and they knew a church was to be built on it, and they wanted this church to be free from other near buildings, to have plenty of light and air and not to be affected by any nuisance of any kind. We take this to have been their intention in placing in their deed these restrictive clauses. It is true the law does not favor them, and they are to be construed most strongly against the grantors or the parties in possession. Nothing can be raised in their favor by inference or implication, but they are to be construed precisely as they stand, as they mean, and was the intention of the parties, which we are trying to do in this case. Then, it is idle to say that this present building of the defendant does not obstruct the view from the church. Before its erection, at a given point in the church, the square in Washington and Fifth Streets could be seen, where now, from that same point, the eyes of the viewer go as far as the defendant's brick wall and there stop. The writer has tried this view himself, which is why we have found in our findings that the erection of this building is an obstruction to view. An added third story may not make any great change in the view except as to the upper part of the church, the roof, tower and the like.

The new building of the defendant is 35 feet from the southern wall of this church. Built two stories, as it now is, we do not think the light is much affected; however, small as the deprivation of light may be, the plaintiff is entitled to it. The deed does not state how much light; but what light existed when it was given, it is now entitled to. The addition of a third story would, in our judgment, very much deprive this congregation of light.

Huntingdon Presbyterian Congregation *v.* Stewart.

During early spring, winter and late fall months, the beams from the sun fall upon this church from the south, much more so than during the summer months, when the sun shines more vertically upon it, and with a three-story building there, we are strongly of the opinion the defendant's proposed three-story building would very materially affect the light due to this congregation.

We are reminded that the windows of this church are composed of stained or art glass. This is true, but should this art glass be removed and plain glass substituted, what then? This congregation would be seeking for light which was taken from them. How would this intended three-story building then affect this church? To ask the question is to answer it. Testimony has been produced tending to show that during nearly all the services in this church electric lights must be turned on, and at times they were used before the erection of the Stewart building, but we must remember that on dark, murky days, in modern ways of living, lights are frequently turned on in our dwelling-houses, so that we do not accept this as a valid argument on either side.

Now, as to the air. Free and unobstructed air is what this church is to have. Can they have the same degree of air with a three-story building 35 feet away as they would have were the building 58 feet away? Certainly not. The breezes from the south cannot reach them from the top of a 33-foot building unless by some process of legerdemain unknown to us they, for some unaccountable reason, take a sudden drop from the eave of the 33-foot building, which is very unlikely. When these good people are doing their best, on a hot, sweltering Sabbath Day, to serve Almighty God in their humble way, the breezes from the south would pass on from this 33-foot roof of the defendant, strike the sloping roof of the church, take a sheer upward, and go, no one knows where, but surely not into the church. Some fine spun theories were developed by several of the witnesses for the defence contending that, between buildings built close together, a draft would occur between them where none before existed. This may be true, so far as it goes, but how would a draft between the buildings help those within them? We want the air in the buildings, not between them. We want to pass inside the building, not like the Priest and the Levite in the Jericho story, pass by on the other side, or on the outside. We feel confident that the two-story building, as it now stands, very substantially deprives the plaintiff of the free and unobstructed air to which they are entitled, and a third story will do so much more so. Conditions would not then be as the Colestocks intended them to be.

And now we come to a consideration of the garage proposed to be erected. It is proposed to be built of brick, 10 feet high, with a flat roof, and 18 feet by 17 feet, or, as some witnesses stated, 20 feet by 17 feet, to be set back 30 or 35 feet from Fifth Street, and to be fire-proof, with no windows facing the church nor on the west side of it. In it are to be housed the pleasure touring car and the delivery truck of the defendant. According to our mathematics, the garage would be 15 feet away from the church wall and the windows in that wall. We do not believe it would interfere with the light, but we do believe it would be an obstacle to the view and to the air. We think we should take judicial cognizance of the purpose and use of garages. True, this is to be a private garage, housing only two cars, but only 15 feet away from the church. We all know that where cars are kept there will be the odor of oil and gasoline. Keep it as clean as you will, this cannot be helped. The odor of either is very penetrating and can very easily be carried more than 15 feet. Then, it is also well known that when the engine of the car is in operation, deadly monoxide gas is discharged which pervades the atmosphere for more than 15 feet. It is also well known that, in starting the engine in the most

### Huntingdon Presbyterian Congregation v. Stewart.

quiet running machines, there is some noise, and in some there is a great noise. These are surely not elements one would desire to have next to his dwelling. In fact, they are very undesirable. Then, to enter or to leave this garage, it would be necessary to cross the west pavement of Fifth Street each time. Close by where this pavement would need to be thus crossed we have the side entrance to this church leading to the Primary Sunday School room used by 90 per cent. of the children attending, as well as by adults attending the various meetings of the different church bodies. With the entrance of cars to this garage as well as their backing out, we must say we consider it as a menace to public safety, especially so far as concerns the children. They do not see the danger as grown-ups do, and when leaving the church after their session, rushing out pell-mell, as they are wont to do, we are very fearful some of them might rush in the way of a car moving over Fifth Street pavement and be killed or seriously injured. It may be said this is speculative, but it is far better to act before the life of some child is crushed out than to cast bouquets on its coffins when it is buried. Speaking proverbially, it is far better to lock the stable before the horse is stolen. It is said the truck will never be taken out on Sunday, but the testimony shows that it has been, and we do not doubt but that it will be again. This garage is said to be fire-proof, but with a fire in this garage, we would be very fearful of it igniting the church, and with gasoline and oil and the back-firing of cars, defective wiring of cars and the like, fires are very apt to occur where least expected. This danger of these cars crossing this Fifth Street pavement is not complained of in the bill, although it was brought out in the testimony; but we think it better to take this matter into consideration at this time than to necessitate another action for this cause alone later on. Garages, although a necessity, are being relegated to locations not so public nor so dangerous: Tyson et al. v. Coder, 83 Pa. Superior Ct. 116; Prendergast et al. v. Walls et al., 257 Pa. 547. Although these two citations refer to public garages, it seems to us, nevertheless, that quite a number of the principles in them mentioned can well be applied to the case before us.

In passing upon these questions, we are keeping in mind that the findings of a judge which involve the credibility of witnesses and the weight to be given that testimony will be given the effect of a verdict of a jury (Tyson et al. v. Coder et al., 83 Pa. Superior Ct. 116), and we are trying to dispose of them with this *dictum* before us.

Although restrictions in a deed may seem repugnant, as long as they are not unlawful, it is to no purpose to argue that they seriously retard the improvement of a city. We can no more strike down by a decree a lawful restriction creating an easement than we can compel a lot owner to erect buildings in accord with the best style of architecture: Landell et al. v. Hamilton et al., 175 Pa. 327, 336. A testator may make disposition of his property by will not in conformity with the wishes of his heirs; but as long as such disposition is lawful, it must stand and will be enforced. And, by a spirit of analogy, lawful provisions, restrictions and reservations in deeds must be observed. The sanctity of the legal contract entered into between grantor and grantee should be respected, preserved inviolate and enforced.

As a principle of law, it may well be said that courts of equity will not award an injunction to abate a private nuisance, but will relegate the party to his action at law, with which we heartily agree; but relative to this proposed garage of the defendant, as well as the injuries complained of by the erection of the building as it now is, as well as to how it is proposed to finish it, affecting a congregation of 600 people or more, we are disposed to treat it

as graver in nature than a private nuisance. An injured plaintiff might well bring an action at law, or he may file his bill: Orne *v.* Fridenberg, 143 Pa. 487. And in the case at bar, had the plaintiff brought an action at law, the defendant could have gone on and finished his proposed buildings, the very thing the plaintiff wanted to prevent.

It is maintained by the defence that no injunction can be granted in this case for the reason that the plaintiff's rights are not established, and numerous cases are cited tending to sustain this position. Mandamus and injunction are creatures of equity. Mandamus to enforce an established right, and injunction to restrain the infringement of one, and it is true that the right must first be established. In the case at bar the Colestocks deed clearly establishes the right of the plaintiff to free and unobstructed view, light and air, and also prohibits the erection of any building which would prove to be a nuisance. We fail to see how it would be possible to more clearly set out the plaintiff's rights. Here they are already established by deed. No suit at law is necessary. To first sue at law to ascertain a right already in existence would be a vain and useless thing, which the law does not require.

And now we come to consider the alleged laches of the plaintiff as set up by the defence. This occurs where a party has been guilty of neglect in enforcing his right by great delay and lapse of time. This circumstance will, at common law, prejudice and sometimes operate in bar of a remedy which is discretionary and not compulsory in the court to afford: Bouvier's Law Dictionary.

It is also defined in 21 Corpus Juris, 210, as a neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. More specially it is inexcusable delay in asserting a right; an implied waiver arising from knowledge of existing conditions and an acquiescence in them; such as will warrant the presumption that the party has waived his right.

The defendant began his building operations on March 22, 1926, and the injunction was not issued till May 17, 1926, nearly two months. The defendant claims that, as the plaintiff congregation saw and knew what he was doing from the day he began and did nothing to stop him till nearly two months had elapsed, not till he had his new building erected to a height of two stories, and not till he had expended the sum of $5365, they are now estopped from any proceedings to prevent him from completing his buildings as he had purposed.

We cannot entirely agree with this position. It is true the building in the course of erection is immediately next to the church. It is true that long before May 17, 1926, the plaintiff could, ought and did see the operations of the defendant. They should have immediately, within a short time after March 22, 1926, applied for the injunction. By waiting near two months before so doing, we think they were somewhat derelict in taking the proper steps to protect their rights. A congregational meeting, if such was necessary, could have been called by two weeks' public announcement, at least we were so told in open court at the argument of the case. Then, why was it not done promptly? Why wait for nearly two months, till the defendant had expended over $5000 on his building, then apply for the injunction and ask the court to compel the defendant to tear down his building on which he has spent such a considerable sum of money? We fail to see why. March 22nd fell on Monday. We fail to see why a congregational meeting could not have been called on the following Sunday, March 28th, and on two weeks thereafter, on April 11th, some definite action could have been taken before this

defendant had expended this said sum in his building operations. We do not think this plaintiff has been at all diligent in the protection of its rights. We cannot say as a matter of law that it has been guilty of laches, but it comes very near to it. It is true this defendant knew of the rights of the plaintiff. His deed from Akers told him so. The trustees of this church told him so. He was told if he proceeded to build he would be restrained by injunction. Nevertheless, he went on with his building. It had been far better had both parties submitted the disputed question to the court for disposition on a case stated before anything was done. Then each would have had a legal decided base on which to stand. Silence for a reasonable time does not impute laches: Phillips *v.* Donaldson, 269 Pa. 244. And in the case of Lavan *v.* Menaker, 280 Pa. 591, no action was taken for nine months after the right had accrued was not considered laches.

We feel it is not equity for this plaintiff to see the erection of this two-story building all through its different stages, till this defendant has expended this sum of money, then to ask him to tear down his building, lose the amount expended thus far and, in addition, lose the cost of labor incident to its demolition, when it could have moved at a far earlier stage of the proceeding.

From our discussion of the case we arrive at the following

### Conclusions of law.

1. The plaintiff is entitled under the provisions of the Colestock deed of April 1, 1871, to the free and unobstructed view of its church to it and from it, from and over the defendant's lot, as it existed at that time and as was intended by the parties thereto.

2. The plaintiff is entitled under the provisions of the Colestock deed of April 1, 1871, to the use and enjoyment of free and unobstructed light and air passing over that part of lot No. 155 now owned by the defendant, as was contemplated by the parties thereto.

3. The plaintiff is entitled to an injunction, permanent in character, enjoining, restraining and preventing the defendant, his agents, employees or any person or persons for him or in his behalf, from the erection or construction of a third story to the two-story building already by him erected, the same being referred to and mentioned in this proceeding.

4. The plaintiff is entitled to an injunction, permanent in character, enjoining, restraining and preventing him, his agents, employees or any person or persons for him or in his behalf, from the erection or construction of the proposed garage, south of the church building, the same being referred to and mentioned in these proceedings.

5. The plaintiff is entitled to an injunction, permanent in character, enjoining, restraining and preventing him, his agents, employees or any person or persons for him or in his behalf, from erecting or constructing any building on the land lying between his present two-story building and the church building of the plaintiff that would in any manner interfere with or obstruct the view of the church, to it or from it, or with the free and unobstructed air and light passing over the defendant's lot, or that would prove to be a nuisance.

6. That the plaintiff is not entitled to a mandatory injunction requiring the defendant to tear down and remove his two-story building as recently erected by him on his lot adjoining the church lot.

7. That the defendant pay the costs of these proceedings.

### Decree.

And now, to wit, Aug. 31, 1926, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

Huntingdon Presbyterian Congregation v. Stewart.

The preliminary injunction heretofore granted is hereby made perpetual, enjoining, restraining and preventing the defendant, his agents, employees or any person or persons for him or in his behalf, from erecting or constructing the proposed and contemplated garage on the northern end of his lot, lying south of the southern end of the plaintiff's lot, or any other building of whatever kind or nature, that would interfere with or obstruct the free and unobstructed view of the plaintiff's church, to it or from it, or the free or unobstructed use of air and light from the defendant's lot, or that would prove to be a nuisance to the plaintiff.

The defendant, his agents, employees or any person or persons for him or in his behalf, are also hereby enjoined, restrained and prevented from adding a third story to the new two-story building recently by him erected on his lot, or to add any further height to it except such as may be necessary for a flat roof covering, which he is directed to place thereon.

The full jurisdiction of this court to remain in this case and this decree and order to be a continuing one till the provisions hereon be fully complied with.

It is further ordered, adjudged and decreed that the defendant pay the costs of this suit.

From R. W. Williamson, Huntingdon, Pa.